## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 18-25429-CIV-GOODMAN
### [CONSENT CASE]

MAITE MARTINEZ,

     Plaintiff,

v.

CHERRY BEKAERT, LLP,

     Defendant.

_____/

### <u>ORDER ON DEFENDANT'S SUMMARY JUDGMENT MOTION</u>

Maite Martinez is a certified public accountant who used to work for the Cherry Bekaert, LLP firm ("CB") as a litigation support staffer in the firm's family law accounting support practice. She provided reports, calculations and analysis and, significant here, reviewed and critiqued opposing counsel's discovery and their experts. Martinez would often testify at hearings and trials about her opinions on financial issues and the division of matrimonial assets.

According to Martinez's First Amended Complaint [ECF No. 11], *opposing* experts hired by *opposing* counsel harassed and threatened her. She advised her CB supervisors but, she says, they did "very little or nothing." [ECF No. 11, p. 2]. After her complaint was allegedly neglected, she advised the firm's litigation department managing partner, but he told her to ignore the opposing experts, and nothing further was done.

Martinez says she suffered two stress-related seizures. She then noticed that her workload decreased. She claims that she had no other option than to resign (more than a year after the alleged harassment by the opposing side's experts). She classifies her resignation as a constructive discharge.

After her employment with the firm ended, she filed this lawsuit against her former employer (CB), alleging federal and state civil rights violations for unlawful and discriminatory employment practices on the basis of gender and retaliation. She did not, however, name as defendants the very opposing experts who allegedly harassed her, and she did not sue the attorneys who hired them, either.

CB contends that it *did* take adequate proactive measures to help eliminate the dispute with the two opposing experts. Noting that it does not control opposing experts retained by opposing law firms, CB's position is that it took adequate measures and therefore cannot be held liable for harassment by professionals it does not control. In addition, it notes that Plaintiff received a promotion and compensation increase of approximately 17% during her last year at CB, which also asked her to reconsider her decision to leave the firm.

CB filed a summary judgment motion [ECF No. 54], arguing that (1) it cannot be liable for the improper conduct of non-CB employees who they did not control, especially when it took appropriate corrective action; (2) the record evidence does not support Martinez's claims that she was treated unfairly because of her gender; (3) she was not

subject to any type of adverse employment action; (4) she was not subject to a hostile work environment; and (5) the statute of limitations bars her claims.

Martinez filed an opposition response [ECF No. 105] and CB filed an amended reply [ECF No. 117].

In her response, Martinez promotes the theme that "this case [is about] sacrificing your own employees in order to make money." [ECF No. 105, p. 1]. She contends that CB's Miami managing partner was confronted with a "choice" when Martinez complained about the alleged sexual harassment and intimidation by the opposing firm's accounting experts: "maintain his relationship with the family law accounting community" and his relationship with the opposing experts and the lawyers who hire family law accounting experts or "risk jeopardizing these decades long professional relationships that involved co-marketing and reciprocal referrals by doing the right thing for Plaintiff, [its] own employee." *Id.* at p. 1.

She further argues that CB "chose to protect the professional relationships" with the opposing experts and their firms "over protecting Plaintiff." *Id.* According to Martinez, the reason is "simple: protecting Plaintiff would have hurt" the "revenue and income" of the firm's Miami managing partner. *Id.*

Martinez contends that CB *can* be liable for the sexual harassment of non-employees -- by condoning or tolerating the environment and by failing to adequately respond. She also points to circumstances which, to her, evidence retaliation and a hostile

3

work environment. And she argues that her claims are not time barred because of the continuing violation doctrine.

Following extensive briefing, the Undersigned held a 3.5-hour hearing on CB's summary judgment motion. [ECF No. 126].

For reasons outlined in greater detail below, the Undersigned **grants** the motion **in part** and **denies** the motion **in part**.

## I.   Undisputed Factual Background[1] and Procedural History

### A.  <u>Facts Highlighted By CB</u>

1.   Plaintiff obtained her Certified Public Accounting license in 2001 and started working in the divorce litigation practice of the CB accounting firm in July 2015.

2.   Plaintiff was hired at CB after its Miami managing partner, Philip Shechter, served as the Plaintiff's forensic accounting expert in connection with the Plaintiff's personal divorce proceeding.

3.   N/A

4.   In Miami, there are approximately ten (10) forensic accountants who are

---

[1]     The facts are generated from the paragraphs in each side's Statement of Facts or Reply Statement of Facts which the opposing party expressly agreed are undisputed. For those purported facts which the opposing party classified as *partly* disputed, the Undersigned includes only the undisputed portions. The Undersigned will retain the paragraph numbering used by the parties. The abbreviation, "N/A," means that the paragraph is disputed. The Undersigned sometimes changed the wording of an undisputed fact for stylistic and/or grammatical purposes. In addition, to enhance readability, I removed the specific record citations. They can be found in the initial source document if needed.

frequently retained as testifying experts in larger divorce proceedings. Two of those experts, Philip Shechter and Michael Everett, were CB partners at all relevant times.

5.      Frequent forensic accountant experts in Miami include Paul Garcia and Eric Neuhof, from Paul Garcia, P.A.

6.      N/A

7.      N/A

8.      N/A

9.      When asked, "Has Cherry Bekaert ever had any level of control over you?," Paul Garcia responded, "zero."

10.     N/A

11.     Everett (a former income partner at CB who was supervised by Shechter) testified that he "enjoyed working with her [i.e., Martinez] and I thought her work was excellent." In her deposition, Melissa Goldberg (an assistant manager who worked in CB's forensic accounting/financial division) testified, "I think we all liked Maite and she liked us."

12.     Plaintiff received multiple promotions and more than one raise during her work relationship with CB.

13.     Plaintiff testified that Garcia said "things against women" in a divorce case and that Neuhof harassed her by using the word, "FUCK," in his emails to her.

14.     Garcia was the opposing side's forensic accountant in the *Abreu* divorce

case. At all times relevant to this lawsuit, forensic accounting expert Neuhof worked for Garcia's accounting firm.

15.     Plaintiff, as an expert on behalf of Ms. Abreu, and Neuhof, as the adversarial expert on behalf of Mr. Abreu, attended a Court hearing in the *Abreu* divorce proceeding on September 7, 2016.

16.     In the Family Courthouse in connection with the *Abreu* Court hearing on September 7, 2016, within Plaintiff's earshot, Neuhof **referred to Plaintiff as a "cunt"** to the attorney who hired the Plaintiff to be Ms. Abreu's accounting expert. (emphasis added).

17.     Shortly after the hearing on September 7, 2016, competing expert Neuhof told his partner, Garcia, about the incident described above (and about comments which Plaintiff supposedly said about Neuhof). Garcia testified he became "very upset" about a site visit involved in the *Abreu* case.

18.     As a manner of expressing his purported frustration, competing expert Garcia sent a text message to CB's Shechter that said he (Garcia) was going to **"cut her [Plaintiff] open and remove her liver."** (emphasis added).

19.     Garcia testified that he had no intention of harming the Plaintiff when making this comment in a text message to Shechter.

20.     Garcia testified that part of the reason why he was so upset with the Plaintiff was his belief at the time that she had filed a complaint against Neuhof with the Florida

Board of Accountancy.

21.     Plaintiff was upset when she returned to the CB office after the September 7, 2016 hearing. Everett testified that she was "upset at what happened in the Court" and "she was not happy about it."

22.     Upon her return, Everett informed Plaintiff that competing expert Garcia sent a text message to Shechter about cutting out Plaintiff's liver.

23.     N/A

24.     After the Plaintiff read Garcia's text message, she sent the below email directly to Garcia:

> Paul,
>
> I am in receipt of your latest communication where you warn of upcoming "war" and you graphically describe how you are going to "tear out my liver," among other things.
>
> The multiple harassing emails from Eric Neuhoff, false accusations that I reported him to the board of accountancy, him calling me the "c" word in front of other professionals outside the court room yesterday, your malicious and constant defamation of my character, including having me removed from a case, will no longer be ignored.
>
> Your agenda is unclear and irrelevant, but your threats are not. Phil and Mike's multiple attempts to diffuse yours and Eric's behavior have been unsuccessful.
>
> However, your latest threat of causing me bodily harm is a criminal offense that will be addressed accordingly.

25.     Competing expert Garcia sent the below email to Plaintiff within minutes of receiving the above email:

Maite:

DON'T YOU THREATEN ME!
YOU ARE MESSING WITH THE WRONG GUY! THIS IS NOT ERIC NEUHOFF THIS IS ME.
**BRING IT ON!** I GUARANTEE YOU WILL LOSE THE BATTLE. STAY THE HELL AWAY FROM ME, AND THIS IS A WARNING.
YOUR LATEST OUTBURST IN COURT WAS WITNESSED BY MANY PEOPLE. YOU DO WHAT YOU NEED TO DO AND I WILL DO AND MY FIRM THE SAME.
Phil/Mike if you forwarded this "PRIVALEGED" [sic] communications to this woman, it was done WITHOUT MY CONCENT [SIC] AND APPROVAL.
What the HELL is this SHIT PHIL?
You guys want **WAR .........YOU FUCKING GOT IT!**
MAITE, DO NOT EVER EVER EVER EVER AGAIN ADDRESS ME, SEND ME AN EMAIL, TALK TO ME, **STAY THE FUCK AWAY FROM ME. I AM WARNING YOU!**
YOU TAKE THIS WHEREVER YOU WANT. I WILL DEFEND ME, MY STAFF, MY FIRM VIGOURISLY [sic].
PHIL, **DON'T YOU HAVE THE BALLS TO STOP THIS WOMAN** OR WHAT! DO YOU REALLY WANT ME TO TAKE THIS TO HIGHER LEVELS OF CHERRY BEKAERET? THIS IS INSANE. (emphasis added).

26.    Shechter testified that upon receipt of the above email from competing expert Garcia, he called Garcia and reprimanded him for sending this unacceptable email.

27.    Recognizing that it appeared CB and the competing expert's firm were "at war" with each other, Shechter felt it would be best to try to use his personality to diffuse the situation since "we are all going to work in the same industry for a long time."

28.    Shechter testified that it is not within his personality to respond to a competing expert's behavior with equal force and his "goal for CB was to try to diffuse the situation rather than pour gasoline on the situation, and "so rather than tell (Garcia)

. . . to F off and then create a bigger war, which would only cause more problems for (Shechter) and (Plaintiff) . . . (Shechter) decided it was better to diffuse the situation and try to get peace, so we all can move on in the same industry."

29.     Plaintiff was upset with Shechter because she felt his approach to dealing with the unacceptable behavior from the competing experts was "too passive" since Shechter did not tell Garcia to "screw off."

30.     When asked by Plaintiff's counsel, "What effect on (Plaintiff's) work environment did this have and your decision to be peacemaker rather than to fight fire with fire," Shechter responded:

> It had no effect on anything. I had full respect for her. I even told her I was proud of her to standup to them. I said do not let them get to you, you are doing the right thing, concentrate on your work, concentrate on the schedules and the work, do not allow these – do not let these people try to get to you. There will be more people that will try to intimidate you in your career. Do not allow them to intimidate you. Be the professional, stand above it, ignore it, move forward, that is what going to be better for you and so I encouraged her. I [thought] that [it had] no effect in her work for Cherry Bekaert, if anything I was kind of proud of her for having the guts to stand up to people. I found that something to respect Maite for.[2]

---

[2]     Plaintiff says this paragraph is disputed, but her position is not a well-taken one and the Undersigned rejects it. This paragraph simply **quotes from a deposition**. Plaintiff does not argue that the deposition excerpt is inaccurate or taken out of context. Instead, she simply says that Shechter was *wrong* when he testified that there was no effect. Plaintiff's contrary position does not generate a bona fide dispute because the fact proffered by CB here is in fact true: i.e., Shechter did in fact *say* this at his deposition. The Undersigned acknowledges that Plaintiff contends that there *was* an effect (which would mean that Shechter was incorrect when he said otherwise in his deposition testimony).

31.     As a result of competing expert Garcia and Neuhof's behavior towards Plaintiff, CB conducted a phone conference involving Plaintiff, Shechter, Everett, and CB's Managing Partner based in North Carolina, where options for dealing with the situation with the competing experts were discussed. Options presented to the Plaintiff included: (a) CB would support Plaintiff if she decided to file a criminal complaint or ask for a restraining order against competing expert Garcia; (b) CB would respect Plaintiff's wishes if she wanted to be disassociated from cases involving competing experts Garcia or Neuhof, and CB would allocate the Plaintiff other work so that her overall workload would be uninterrupted; (c) The Plaintiff was alerted to the fact that building security could walk her to and from her car to the office each day; and (d) CB changed the lock system for its Coral Gables office.[3]

32.     Plaintiff ultimately informed CB that she wanted to *continue* working on cases involving competing experts Garcia and Neuhof. (emphasis added).

33.     During the entire time that Plaintiff worked at CB, she can recall a total of four (4) cases where Garcia and Neuhof were the competing side's forensic accounting expert.

34.     Garcia asked Shechter to remove Plaintiff from cases involving his firm.

---

[3]     Plaintiff contends that this entire paragraph is disputed. However, the evidentiary citation she provided to support her view that a factual dispute exists does not create a dispute. In fact, the paragraph she relies on does not even directly address the subject of the paragraph at issue here, which concerns a conference call in which alternatives were presented. The Undersigned therefore deems the paragraph to be undisputed.

35.    N/A

36.    N/A

37.    In 2016, Plaintiff was promoted at CB to be a Manager and received an increase in salary as a result of the same. Plaintiff points out that the decision to give her a promotion and a salary increase was made *before* she complained on September 8, 2016 about Garcia, Neuhof, and Garcia's firm.

38.    Plaintiff's pay records reflect that her income in 2017, the year after the dispute with the competing experts, increased by $15,873 from the prior year. Plaintiff says this fact is misleading because it was based on the calendar year system, while CB used the fiscal year method to record her pay, and the records do not show whether they represent fiscal or annual pay.

39.    N/A

40.    Plaintiff continued to work for CB for approximately fifteen (15) months from September 2016, when the issues involving the competing experts arose. She voluntarily resigned from CB in December 2017.

41.    In her deposition, Plaintiff testified that she did not resign from CB as a direct result of comments or actions from the competing experts, Garcia and Neuhof.[4]

---

[4]    Plaintiff contends that CB's view of the version for her resignation is disputed. But she did testify in her deposition in the way noted above. And the source material she cited as grounds to support her contention that a factual dispute exists (i.e. paragraphs ¶¶ 18-32 from her declaration [ECF No. 103-1]), do nothing to change her deposition testimony. Thus, the Undersigned views this paragraph as not genuinely in dispute.

42.     Plaintiff continued to work for CB on a full-time basis for four (4) weeks after giving her notice of intent to resign from CB on December 20, 2017.

**B.  Facts Highlighted by Plaintiff**

43.     When asked if Shechter had stood up to Garcia instead of "accepting" his behavior, Garcia responded that he would have "[acted] very negatively' and he would have "continued to be on a rampage, [and he] would have continued to be mad, [he] would have escalated things . . ."

44.     In his deposition, Garcia testified, "Look, I have seen Maite, I have seen her with my own eyes in that modification action. I know how she can get. I did not need to be in Court, I did not need to be there. I know how she can get, trust me. So, I am telling Phil and Mike, come on man, **control this** *woman*." (emphasis added).

45.     Garcia's email to Martinez said, "Do not interact, do not send me an e-mail, do not talk to me, stay the fuck away from me, I am warning you."

46.     Garcia gave the following deposition answer to the following question:

> Q Phil Shechter ever called you up and asked you to apologize?
> A No. I do not think so. I do not remember, I do not remember. I am never going to apologize to her. I did nothing wrong.

47.      Plaintiff testified that she was promoted sometime around April of 2016 to the position of "right under manager."[5]

---

[5]     Plaintiff's statement of undisputed facts [ECF No. 115] incorrectly lists ECF 51-1 as the source material. It is actually ECF No. 57-1. She apparently did this with all references to her own deposition, which is in the record at ECF No. 57-1, not 51-1.

48.     Plaintiff was promoted to "manager" in the winter of 2016.

49.     Plaintiff's yearly bonus was contingent on her "book of business."

50.     After being promoted to "manager" in 2016, Plaintiff was not promoted again.

51.     Plaintiff remembers working on at least four cases where Garcia was the opposing expert. (*Abreu*, *Mata*, *Pantoja*, *Enriquez*).

52.     The first sign that Plaintiff was having problems with Garcia was during the *Mata* case, where Garcia would say "things against women."[6]

53.     Plaintiff testified that she was made to feel uncomfortable by both Garcia and Neuhof.

54.     During Plaintiff's deposition, her counsel chose to not ask any follow-up question about what made her uncomfortable regarding her interactions with Garcia and Neuhof.

55.     Plaintiff was being harassed by Neuhof during the *Abreu* case, and she notified both of CB's partners (Everett and Shechter) of the harassment.

56.     Plaintiff explained that she personally did not have a "contentious history

_____

[6]     Plaintiff already knew Garcia before she joined CB. In fact, Garcia served as her former husband's forensic accounting expert in her divorce. [ECF Nos. 57-5, p. 75:13-19; 57-1, pp. 32-33]. Plaintiff says that Garcia has "an unwarranted and personal vendetta" against her, while Garcia says that his involvement in her divorce created animosity on her part, causing "her frenziness" toward him. *Id.*

13

with Paul Garcia." The hostility was one-sided or unilateral and it was directed only at her by Neuhof and Garcia.

57.  N/A

58.  N/A

59.  The abusive emails from Neuhof made Plaintiff angry and at times caused her to be depressed. Instead of going home feeling like she had accomplished something and properly advocated for her client, by properly doing her due diligence, she would go home angry that she was being treated badly and harassed.

60.  Neuhof referred to Plaintiff as a "cunt" before a hearing where Plaintiff was present with CB's client and the client's attorney.

61.  Upon returning to the office, Plaintiff learned from Everett that Garcia (Neuhof's boss) had sent Shechter a text message to the effect that Garcia was going to "cut [her] open and remove [her] liver."

62.  Upon learning of the text message, Martinez confronted Shechter and asked him about Garcia's text message. Shechter refused to share the contents of the text message with Martinez. She demanded to know if what Everett had told her was true and whether Garcia had threatened to "cut me open and remove my liver." Shechter refused to answer the question.

63.  N/A

64.  Plaintiff requested and obtained a meeting with Shechter, Everett, and Moss

14

to discuss her efforts to determine how CB would react to Garcia's threatening email. However, what happened at the meeting is very much in dispute.

65.     CB offered Plaintiff the ability to have herself removed as the forensic accountant on all cases in which Paul Garcia, P.A. was the competing expert. However, that never occurred, as Martinez rejected the offer.

66.     Martinez never received an apology from either Neuhof or Garcia.

67.     Working as a forensic accountant in divorce cases is not a competition. The role of a forensic accounting expert is to assist the attorney with financial discovery and present the findings to the attorney and to the Court, if needed.

68.     CB matrimonial forensic accounting cases were at the time handled by either Shechter or Everett, who served as the partner in charge of the case. Then, Shechter or Everett decided which CB manager would work the case.

69.     N/A

70.     Attending depositions, mediations, or hearings at CB for the client was always a priority.

71.     Shechter told Plaintiff that it was better to "make peace" than to "go to war with Paul [Garcia]."

72.     N/A

73.     N/A

74.     Everett assigned Martinez two additional cases where Paul Garcia P.A. was

the opposing forensic accounting firm.

75.    On or about December 2, 2016, Plaintiff was instructed by Shechter to attend a hearing in another case, instead of attending the *Abreu* mediation. The client (Ms. Abreu) texted Martinez, asking her why she was not present because "she really wanted [her] there." Normally, Plaintiff would have been there during the entire mediation. She was given the "green light" to attend after it was determined that Garcia's office did not attend (Paul Garcia P.A. represented Mr. Abreu).[7]

76.    On or about October 5, 2017, Plaintiff was not "invited" to the initial meeting with counsel and client in the *Pantoja* case because the meeting took place at the Paul Garcia P.A. office. This was unusual because Martinez was normally included in these types of meetings and she was not present to take her own notes.[8]

77.    On or about October 23, 2017, Martinez insisted on attending a hearing on a case she had been working on (in a limited capacity) because the client (Ms. Garcia) requested she attend. Garcia was the opposing forensic expert. When the hearing ended, Garcia approached Everett and demanded in a loud voice that he explain the reason for allowing Plaintiff to be there despite his demand that she not be associated with any cases where he was on the other side. Martinez says she felt humiliated, and when she

---

[7]    CB does not dispute the above, but it challenges as factually incorrect "the implication that Plaintiff's role in the Garcia cases was diminished."

[8]    CB challenges as factually incorrect "the implication that Plaintiff's role in the Garcia cases was being purposefully diminished."

explained her feelings to Everett, he said "That's just Paul Garcia."[9]

78.     On or about November 29, 2017, Martinez was not invited to a discovery hearing in the *Pantoja* case because it was expected that Paul Garcia's office would be in attendance. During the hearing, Everett had to call Martinez to obtain the relevant information regarding the discovery disputes (which Plaintiff would have typically had with her if she attended the hearing). It was very unusual for a Partner to attend a discovery hearing; Plaintiff was normally the person who would attend.[10]

79.     On or about November 30, 2017, Everett told Martinez that she did not need to attend the depositions in the *Garcia v. Enriquez* case. Plaintiff contends that this was very unusual because she was the person who had drafted the deposition questions for the husband, Mr. Enriquez. Aside from always attending client and spouse's depositions (as she typically participated by providing counsel with follow up questions), Martinez contends that her non-appearance would be a disservice to the client (because of an increased risk that important financial issues would be omitted). Also, Martinez said her absence generated embarrassment (caused by the client asking why Martinez wasn't there). Plaintiff also notes that being forced to lie was very unprofessional.[11]

---

[9]     CB challenges as factually incorrect "the implication that Plaintiff's role in the Garcia cases was being purposefully diminished."

[10]     CB disputes the implication that Everett testified that he agrees with her characterization that Plaintiff's role in the Garcia cases was diminished.

[11]     CB mounts the same challenge about the implication from Everett's testimony.

80.  N/A

81.  High-profile cases were important at CB because they provide exposure with judges (court appointments) and high-profile family law attorneys who later would request that Martinez be placed on their cases, a scenario which would have helped her to be promoted.[12]

82.  N/A

83.  N/A

84.  N/A

85.  Martinez was not promoted above her manager position during the approximate 15 months between the competing expert incidents and her resignation.[13]

86.  A portion of Martinez's increase in compensation was tied to paid time off.

87.  The Holiday Pay that Martinez was paid in 2016 increased in 2017. This was not a raise, although it was an increase in Holiday Pay.

88.  In 2016, Plaintiff was paid for the office being closed (Office Closed) and in 2017 she was paid more for the Office Closed. This was not an increase in salary.

---

[12]  CB says there is no record evidence that Plaintiff was prohibited from working on high-profile cases or that cases against the competing experts were exclusively high-profile cases or that the competing expert cases were the only high-profile cases handled at CB.

[13]  CB challenges the implication that there is record evidence indicating that the lack of a promotion during this time period was related to the incidents with the competing experts

89.    In 2017, Martinez was not informed that she was given a salary increase.

90.    In 2016, Martinez was informed twice (before she complained about the competing experts incident) that she had received a salary increase.

91.    At CB's Miami office, she was the only forensic accountant who spoke Spanish as a first language who was able to testify as an expert. For this reason, Martinez was assigned cases where the clients spoke Spanish (i.e., because she was the best qualified to handle those cases).

**C.  Illustrative Disputed Facts**

Among other issues, the parties dispute the following points:

1.    Shechter's specific response to Garcia's cut-her-open-and-remove-her-liver email (e.g., whether he giggled, whether he told Martinez to "ignore it.").

2.    Whether Shechter's motivations in communicating with Garcia about his email and his treatment of Plaintiff took a back seat to financial reasons to maintain a good working relationship with Garcia.

3.    Whether CB retaliated against Martinez by directing her to avoid depositions in which Garcia's firm would be involved.

4.    Whether workload or allocation of assignments changed in any way after she complained.

5.    Whether Martinez's compensation at CB increased or decreased after she complained about the Garcia firm.

6.     Whether CB prevented Martinez from working on high-profile cases after she complained to Shechter about the competing experts.

7.     Assuming that CB engaged in impermissible sexual harassment, whether the violation was continuing (in order to support a theory that the statute of limitations was extended).

## II.     Procedural Posture

Martinez's First Amended Complaint asserts six counts:

Count I is for Title VII sex discrimination. Plaintiff alleges that the harassment and threats interfered with her work performance. She alleges that CB had a duty to take immediate and corrective action even though the harassers were not its employees. She contends that CB did not fulfill this duty.

Count II is for sex discrimination under the Florida Civil Rights Act, based on the same facts and theory about CB's alleged duty.

Count III is for Title VII hostile work environment.

Count IV is for hostile work environment under the Florida Civil Rights Act.

Count V is for Title VII retaliation. Martinez claims she engaged in protected activity by complaining numerous times to her CB supervisor about the harassment and threats and hostile work environment, and that CB improperly retaliated against her. She alleges an adverse employment action: her role in ongoing cases was diminished and she was assigned fewer cases. Martinez further alleges that the adverse employment action

affected her status at the firm, her ability to advance there, and her ability to receive salary increases and bonuses.

Count VI is for retaliation under the Florida Civil Rights Act, based on the same alleged facts and legal theories.

CB's summary judgment motion does not seek expressly seek relief for the federal and state retaliation claims under Counts V and VI. There is no subject matter heading in its motion which mentions "retaliation" or Counts V and VI.

Nevertheless, CB's summary judgment motion seeks a judgment on the two retaliation counts by attacking a required element of the claim: an adverse employment action. Specifically, Section VI of CB's motion is entitled, "The Record Evidence Does Not Support Plaintiff's Claim That She Was The Subject Of An Adverse Employment Action." [ECF No. 54, p. 10]. Therefore, CB's summary judgment motion does in fact seek a judgment in its favor on the two retaliation counts.

Using a similar style, CB does not mention "sex discrimination" or "Counts I and II" in any argument section in its motion. Rather, it mounts a legal challenge by using titles attacking an element of the claim or underscoring the apparent lack of logic in the claims. Section IV of CB's motion is entitled "CB Cannot Face Legal Liability For The Actions Of The Competing Experts," and Section V is entitled "The Record Evidence Does Not Support Plaintiff's Claim She Was Treated Illegally Based On Her Gender." *Id.* at pp. 5, 8.

### III.   Applicable Legal Standards and Analysis

### A.  <u>Summary Judgment</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citation omitted). Thus, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party must "show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the movant does so, then "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.* A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). The opposing party must proffer more than "a mere scintilla of evidence" to show "that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (internal quotations omitted).

When deciding whether summary judgment is appropriate, the Court views all facts and resolves all doubts in favor of the nonmoving party. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (affirming order denying defendant's summary judgment motion on qualified immunity because of factual issue). And when conflicts arise between the facts evidenced by the parties, courts must "credit the nonmoving party's version." *Id.* at 1252.

If there are any factual issues, the Court must not decide them; it must deny the summary judgment motion, and the case then proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)). The Court cannot weigh conflicting evidence to resolve factual disputes. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (citation omitted) (reversing in part summary judgment). Even when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts," summary judgment "may be inappropriate." *Whelan*, 2013 WL 5583970, at *2; *see generally Johnson v. NCL (Bahamas) Ltd.*, No. 16-21762, 2017 WL 1293770, at *2 (S.D. Fla. Feb. 3, 2017) (denying summary judgment motion in passenger's slip and fall lawsuit against cruise ship operator).

Our Circuit does not hesitate to reverse orders improvidently granting summary judgment motions, and has noted that "even if a district court 'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment

on the basis of credibility choices.'" *Feliciano*, 707 F.3d at 1252 (citing *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).

Moreover, "as a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." *Feliciano*, 707 F.3d at 1253.

**B.  Statute of Limitations**

CB's summary judgment motion contends that "civil actions under the FCRA must be brought within one year of the date on which the alleged unlawful employment practice occurs." [ECF No. 54, p. 18]. It says nothing about the statute of limitations for federal Title VII claims, though.

Martinez filed her Intake Questionnaire with the EEOC on March 9, 2018, alleging sex discrimination and retaliation. She checked the box indicating that she wanted to file a discrimination charge and authorized the EEOC to look into the discrimination she alleged. On March 23, 2018, she filed her Form 5 with the EEOC, which was dual filed with the Florida Commission on Human Relations. Her Form 5 alleged sex discrimination and retaliation by CB.

On September 26, 2018, the EEOC issued a Right to Sue letter. [ECF No. 11-1].

24

Martinez filed her initial Complaint [ECF No. 1] on December 26, 2018.[14]

Because Martinez filed her EEOC charge on March 9, 2018, any discriminatory act she complained of must have occurred within 300 days before then to be timely. *See Brooks v. CSX Transp., Inc.*, 555 F. App'x 878, 880 (11th Cir. 2014) (finding that for a charge to be timely in a deferral state like Florida, it must be filed within 300 days of the last discriminatory act); *see also E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1270 (11th Cir. 2002); *see generally Avila v. Childers*, 212 F.Supp.3d 1182, 1188 (N.D. Fla. 2016).

The Florida Civil Rights Act requires complaints to be filed within 365 days of the discriminatory conduct. Fla. Stat. § 760.11(1) (1999). Because the FCRA is patterned after Title VII, federal case law dealing with Title VII applies. *See Ganpath v. Advance Stores, Inc.*, No. 10-60036, 2011 WL 6069336 (S.D. Fla. Dec. 6, 2011). The Supreme Court has held that the limitations period begins running at the time the employee is notified that the decision was made to engage in the discriminatory employment practice, not when the effects of the decision began. *Delaware State College v. Ricks*, 449 U.S. 250, 259, 101 S. Ct. 498 (1980).

In its summary judgment motion, CB used the one-year statute of limitations for state law civil rights claims, not the 300-day version for federal claims. Therefore, the statute of limitations clock urged by CB is actually more beneficial to Plaintiff. CB

---

[14]     Plaintiff's allegations about these conditions precedent are alleged in paragraphs 8-10 of her Amended Complaint. [ECF No. 11]. CB admitted those allegations in its answer. [ECF No. 24].

contends that any claims based on events occurring before March 9, 2017 (one year before the EEOC claim was filed) are barred.

CB then contends that the events giving rise to Martinez's claims -- Neuhof's nasty comment at the courthouse, Neuhof's crude emails, and the threatening email from Garcia -- all took place in September 2016, approximately six months outside of the statute of limitations. CB further notes that Martinez could not recall any further interactions (after September 2016) with the two competing experts which made her uncomfortable. Therefore, CB argues, all of Plaintiff's claims are time barred.

In response, Martinez urges the application of the continuing violation doctrine. *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 448-49 (11th Cir. 1993); *see also Mitchell v. Miami Dade Cnty. Pub. Sch.*, 06-21663-CIV, 2007 WL 9702834, at *9 (S.D. Fla. Oct. 22, 2007) (internal citation omitted) ("In determining whether a discriminatory employment practice constitutes a continuing violation, the Eleventh Circuit draws a distinction between the present consequence of a one time violation, which does not extend the limitations period, and the continuation of the violation into the present, which does.").

In other words, "the emphasis is not upon the effects of earlier employment decisions; rather, it is upon whether any present violation exists." *Delaware St. Coll v. Ricks*, 449 U.S. 250, 258 (1980).

Martinez emphasizes a few factors to support the continuing violation exception: (1) CB re-assigned her work, a scenario which lasted until her employment ended; (2) the

alleged hostile work environment continued through the end of her employment; (3) CB intentionally failed to give Plaintiff a yearly performance review, a failing which lasted through the end of her employment; and (4) CB gave her only a neutral job reference despite the praise it provided in her evaluations.

In its reply, CB argues that the record evidence contradicts the continuing violation doctrine, highlighting that the issues involving the competing experts were "resolved within a few weeks." [ECF No. 117, p. 11].

Although Martinez's factual support for the continuing violation theory is thin, it is sufficient for now (but barely) to escape an adverse summary judgment ruling.

This does not mean that CB has *lost* its statute of limitations argument. Instead, it means only that CB has not eliminated all genuine issues of material fact relevant to this defense theory. At trial, CB might still be able to prevail if it convinces a jury that the alleged discriminatory acts were not of a continuing nature after March 9, 2017. At trial, of course, Plaintiff would not be entitled to a rule requiring all inferences to be drawn in her favor. And the jury would be permitted to weigh her credibility against the credibility of others, an activity the Undersigned is prohibited from doing in the summary judgment context. *See, e.g.*, *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (citing *Santiago Hodge v. Parke Davis & Co.*, 909 F.2d 628, 633 (1st Cir.1990)) ("[I]n some circumstances, factual issues related to statute of limitations should be put before a jury."); *City of Kingsport, Tenn. v. Steel & Roof Structure, Inc.*, 500 F.2d 617, 618 (6th Cir. 1974) (requiring a jury to

determine factual issues with respect to the statute of limitations defense); *Grisham v. Philip Morris, Inc.*, No. CV 02-7930 SVW RCX, 2009 WL 9102320, at *2 (C.D. Cal. Dec. 3, 2009) ("[S]tatute of limitations-related factual issues must be heard by a jury.").

**C. CB's alleged duty to "do something" about the competing experts' misconduct**

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

To prove sexual harassment under Title VII, a plaintiff must show, among other things, that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004). "Sexual harassment in the workplace can alter the terms and conditions of employment in either of two ways." *Id.* at 1245.

First, the plaintiff must demonstrate "that the harassment culminated in a 'tangible employment action' against her." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006). Second, the plaintiff must show hostile work environment harassment where "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 114 S. Ct. 367, 370 (1993) (internal quotation marks and citations omitted).

Most of the cases which Martinez relies upon to support her theory that CB had a duty to take corrective measures in response to the competing experts' threats and harassment involved hostile work environment claims based on sexual harassment. In fact, her legal argument heading in her opposition memorandum is "Hostile Work Environment Based Upon Sexual Harassment." [ECF No. 105, p. 4].

Those cases do not support Plaintiffs claim here, however, because the misconduct did not occur on CB's property, on property it controls, by a person it controls (e.g., another CB employee) or at the actual CB workplace. Instead, the harassing conduct by Garcia and Neuhof occurred at a courthouse and in emails. This is significantly different than the scenarios involved in the cases cited by Martinez, such as misconduct by a customer at a restaurant operated by the defendant employer or a stalker roaming the aisles of a large store owned by the defendant.

A significant clue that an employer is not liable for the sexual harassment of an employee by a non-employee in a non-workplace setting is a federal regulation which explains when an employer might in fact be liable. *See* 29 C.F.R. § 1604.11 (sexual harassment). Subsection I provides:

> An employer may also be responsible for the acts of **non-employees**, with respect to sexual harassment of employees **in the workplace**, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will **consider the extent of the employer's control** and any other legal responsibility which the employer may have with respect to the conduct of such non-employees. (emphasis supplied).

*Id.*

The harassment by Garcia and Neuhof did not occur in CB's *workplace.* Moreover, CB does not control these opposing experts. The mere fact that CB's managers, supervisors or executives *could have* confronted these experts but did not is insufficient to impose liability on CB for Plaintiff's hostile work environment claim. Unlike a store or place of business, CB could not exclude Garcia and Neuhof from the courthouse or prevent them from using email (i.e., exercising authority at the locations of the harassment).

As expressly noted in the federal regulation governing sexual harassment, the EEOC would also consider whether the employer had "any other legal responsibility" over the conduct of the non-employees. Martinez has identified none. She has, to be sure, cited to cases. But, as discussed below, those cases are not persuasive because they are factually distinguishable -- the harassment occurred at the workplace, at the defendant employer's store, office, or other location, and the misconduct was perpetrated by harassers who the employer could have excluded or disciplined.

For example, *EEOC v Costco*, 903 F.3d 618 (7th Cir. 2018), involved a hostile work environment claim based on a store's failure to adequately protect an employee from harassment by a customer who repeatedly entered the store and bothered the Plaintiff. The Court held that an employer can be responsible for its own negligence for permitting, or failing to prevent, tortious conduct by persons upon **premises under his control.** The

courthouse and the opposing experts' email accounts are not premises under CB's control.

Similarly, the Court in *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073-74 (10th Cir. 1998) involved a hostile work environment claim by a waitress who was sexually harassed in the restaurant by customers. Noting that the restaurant manager had many options available (but failed to take them), the appellate court held that the employer could be liable "since the employer ultimately controls the conditions of the work environment." *Id.*

In contrast, CB did not control the conditions at the courthouse or in Plaintiff's email inbox (or in Garcia's email).[15]

Likewise, the Court in *Dunn v. Washington County Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005) relied upon the *Restatement (2d) of Agency § 213(d)* as support for its holding that there could be liability if an employer was negligent in permitting, or failing to prevent, tortious conduct by others, regardless of if they are his servants or agents, "upon **premises** or with instrumentalities **under his control**." (emphasis added). As noted, the courthouse and the internet (or email accounts or smart phones used by the opposing experts) are not CB's premises, nor are they instrumentalities under its control. The

---

[15]     Our appellate court cited *Lockard*, 162 F.3d 1062, with approval in *Watson v. Blue Circle, Inc.*, 324 F.3d 1252 n.2 (11th Cir. 2003), for the rule that an employer may be found liable for the harassing conduct of its customers if the employer fails to take immediate and appropriate action in response to a hostile work environment to which the employer knew or reasonably should have known.

conduct at issue there involved a doctor who, though technically an independent contractor, worked with the Plaintiff nurse at the very Defendant-owned hospital where the harassment occurred. No such scenario exists here with Martinez, CB, and the opposing experts who harassed her.

Because the courthouse, the internet, and the opposing experts' email accounts are not under CB's control, it is not liable under a hostile work environment claim for the awful threats and harassment perpetrated there by Garcia and Neuhof, who CB does not control. *See generally Neal v. Manpower Int'l Inc.*, No. 3:00-CV-277/LAC, 2001 WL 1923127, at *9 (N.D. Fla. Sept. 17, 2001) (granting staffing agency's summary judgment motion and noting that defendant did not play a role in the management or operations of the facility where the alleged sexual harassment occurred and lacked authority or control over its client's employees).

### D.  Were CB's Own Actions Severe or Pervasive?

To be sure, Martinez alleges other incidents, besides the threats and harassment by non-employees Garcia and Neuhof. But, as explained below, they are inadequate as a matter of law to support a hostile work environment claim.

A plaintiff establishes a hostile work environment claim by showing:

(1) [T]hat she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment . . . [was] based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently **severe or pervasive** to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either

a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (emphasis added).

The fourth element, whether the conduct was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," is the element that often tests the legitimacy of most harassment claims; and that test is true here. *Gupta v. Fla. Bd. Of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).

To establish a sufficient case of hostile work environment, Plaintiff must prove that "the **workplace** is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller,* 277 F.3d at 1275 (emphasis added); *Kavanagh v. Miami-Dade Cnty.*, 775 F. Supp. 2d 1361 (S.D. Fla. 2011).

In deciding whether the harassing conduct is sufficiently severe or pervasive enough to alter the terms and conditions of employment and create an abusive working environment, courts focus on the totality of the circumstances. *See id.*; *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999).

Plaintiff "must prove that the environment was both subjectively and objectively hostile. . . . The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808-09 (11th Cir. 2010) (*en banc*).

33

Concerning the objective component, courts consider (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance. *See Miller*, 277 F.3d at 1275. These factors are assessed under a totality of the circumstances. *Id.* at 1276.

The Eleventh Circuit has affirmed summary judgment for defendants based upon conduct significantly more severe and pervasive than what Martinez has established in this case. *See, e.g.*, *Godoy v. Habersham Cnty.*, 211 F. App'x 850, 853-54 (11th Cir. 2006) (affirming summary judgment where South American plaintiff claimed he was subject to racial slurs "almost every shift," and that his supervisor battered him and told him "to go back to his boat and sail to South America where he belongs"); *Barrow v. Ga. Pacific Corp.*, 144 F. App'x 54, 57 (11th Cir. 2005) (affirming summary judgment where black employee claimed his superintendent told him several times that he was "going to kick [his] black ass"; witnessed numerous other forms of racially offensive conduct and comments; saw the rebel flag on tool boxes and hard hats and "KKK" on the bathroom wall and on a block console; saw a noose in another employee's locker; was called a "n***r" by his supervisor and told he would be "cut" if he looked at "that white girl"; and was called "black boy" and "dumb ass" by two other supervisors).

In fact, the Eleventh Circuit has affirmed defense summary judgments in civil right lawsuits even where there are many instances of misconduct. *See, e.g.*, *Mitchell v. Pope*,

189 F. App'x 911 (11th Cir. 2006) (affirming summary judgment in favor of employer and finding that sixteen incidents of offensive conduct including the supervisor's attempts on three occasions to touch the employee and kiss her and numerous incidents of the supervisor making sexual and offensive remarks to the employee did not constitute the type of "severe" harassment necessary for liability to attach under Title VII). "The concept of . . . harassment is designed to protect working [individuals] from the kind of . . . attention that can make the workplace hellish. . . . It is not designed to purge the workplace of vulgarity." *Rio v. Runyon*, 972 F. Supp. 1446 (S.D. Fla. 1997) (citing *Bosheville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)).

And in an earlier *en banc* opinion, the Eleventh Circuit (in *Mendoza*, 195 F.3d at 1246-47) provided **myriad illustrations** of cases from other circuits where sexual harassment claims based on significantly more egregious misconduct were rejected: *Shepherd v. Comptroller of Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that several incidents over a two-year period, including the comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile-environment claim); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264-67 (5th Cir. 1999) (noting it was "dubious" whether several sexually oriented comments and gestures and an implied threat of retaliation for refusing a sexual advance would be sufficient to establish a hostile environment); *Quinn v. Green Tree Credit*

*Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (holding that statement that plaintiff had the "sleekest ass" in office plus single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir. 1998) (holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers, or buttocks); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (holding offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient under *Harris* because not necessarily gender-related); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753–54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); *Black v. Zaring Homes,*

*Inc.*, 104 F.3d 822, 823-24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns"; suggesting land area be named as "Titsville" or "Twin Peaks"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"; laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently pronounced as "bosom"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (holding insufficiently severe or pervasive to support a hostile-environment claim involving nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); *Kidwai v. McDonald's Corp.*, 21 F.3d 423 (4th Cir. 1994) (holding insufficient under *Harris* seven incidents, including one instance in which harasser asked plaintiff whether "she was in bed with someone"); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims -- that supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work -- were not sufficient for actionable sexual harassment); *see also DeAngelis v. El Paso Mun.*

37

*Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long-lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

Our appellate court continues to cite *Mendoza*, 195 F.3d at 1246, in more-recent opinions assessing the severity or pervasiveness of the harassment. *See, e.g., Allen v. Ambu-Stat, LLC*, 799 F. App'x 703 (11th Cir. 2020) (affirming summary judgment for employer on sexual harassment claims because conduct at issue, including three crude sexual references and two instances of in-office physical touching, were sufficiently pervasive); *Garriga v. Novo Nordisk Inc.*, 390 F. App'x 952 (11th Cir. 2010) (affirming summary judgment in employer's favor in action alleging hostile work environment and retaliation because the challenged conduct -- boorish content, alleged to have occurred on nine days over a period of five months -- was inadequately severe and pervasive); *see also Williams v. Housing Auth. of Savannah, Inc.*, No. 20-10809, 2020 WL 6335946, at *7 (11th Cir. Oct. 29, 2020) (affirming summary judgment for employer in lawsuit for sex discrimination and retaliation claims because the conduct, even though "without a doubt inappropriate and demeaning," was insufficient to satisfy the standard of objective

severity and pervasiveness required for hostile work environment claims).

 Martinez was subject to unacceptable conduct on the part of the competing experts in two primary incidents. First, one of the competing experts called the Plaintiff the "c" word outside of a courtroom. Shortly thereafter, the other competing expert sent an outrageously unacceptable email (to Plaintiff and her boss, Mr. Shechter) and text message (to Mr. Shechter) inferring violence against Plaintiff.

The issues involving competing experts Garcia and Neuhof, on the one hand, and Plaintiff and CB, on the other hand, were, for all practical purposes, resolved within a few weeks. Plaintiff could not recall any further interactions with competing experts Garcia or Neuhof that made her uncomfortable. Plaintiff continued to work for CB for approximately 15 months from the September 2016 issues involving the competing experts until her voluntary resignation from CB in December 2017.

Thus, even if CB could be held legally responsible under Title VII and/or the FCRA for the misconduct of the competing experts (which it cannot), the totality of these circumstances do not rise to the level of sufficiently severe or pervasive to support a cause of action for hostile work environment. Moreover, a successful hostile work environment claim requires misconduct in the *workplace* -- and the misconduct of the competing experts did not occur in CB's workplace. So even if their misconduct was severe or pervasive (which it was not), **CB** would still not be liable on a hostile work environment theory because the competing experts' conduct did not occur in CB's workplace and because CB

is not responsible for *their* conduct.

Having concluded that CB is not legally responsible for the harassing conduct of competing experts, the Undersigned now turns to the conduct of CB's *own* managers, supervisors, and employees in order to determine whether *it* is sufficient to avoid summary judgment on a hostile work environment claim under the severe and pervasive standard.

Martinez does not allege that any CB employee or manager made inappropriate sexual remarks to her or that she was sexually harassed by CB managers and employees. Instead, she relies on a CB investigation (in September and October 2016) of an incident involving Mr. Shechter and a co-worker, Cynthia Lowe. That investigation, conducted by CB's managing partner, resulted in a "stern" letter which Martinez suggests is indicative of pervasive sexual harassment. [ECF No. 105, p. 13].

The Undersigned disagrees and rejects the theory.

The letter says that (1) the Coral Gables Litigation Support section is not a professional environment in which to work; (2) the managers are not properly documenting employment matters; (3) the firm's ability to respond to Lowe's allegations was compromised; (4) Mr. Shechter and other section professionals "demonstrated a complete lack of sensitivity regarding inappropriate topics of conversation, including recounting sexual activities learned from [the] caseload;" and (5) Shechter should refrain from "the sharing of salacious facts from [his] caseload." *Id.* at p. 14.

These circumstances, when compared to the far-more-graphic fact patterns deemed inadequate to meet the severe and pervasive standard in the cases cited above, fall **substantially** short of clearing the applicable legal hurdle. CB is not liable for a hostile work environment claim, and it is entitled to summary judgment on those claims.

### E.   Did CB Retaliate Because Plaintiff Complained About the Competing Experts' Harassment and Threats?

At the hearing, CB's counsel acknowledged that Martinez was not necessarily precluded from pursuing a retaliation claim merely because her claims for sexual harassment discrimination and hostile work environment failed.

In other words, a retaliation claim is still theoretically viable even though the initial subject of a Plaintiff's protected activity (e.g., reporting purported sexual harassment to a supervisor) turns out to be a non-actionable theory. CB's concession about this legal point is hardly remarkable, as it is supported by case law authority. *See generally Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2404, 2416 (2006) (explaining that the "reasonable employee" standard to judge harm is an objective one and is "tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint")[16]; *E.E.O.C. v. Wyeth*, 302 F. Supp. 2d 1041, 1071 (N.D. Iowa 2004) (finding that even though there were still issues of material fact surrounding plaintiff's claims for

---

[16]     The *Burlington* Court noted the importance of separating "significant from trivial harms," and noted that "normally petty slights, minor annoyances, and simple lack of good manners will not" deter discrimination victims from complaining to the EEOC, the courts and their employers. *Id*. at 2415.

sexual harassment, there was a close temporary nexus between female employee's filing administrative complaint of sexual harassment by coworker and adverse employment action consisting of employer's acceding to other coworkers' allegedly retaliatory requests not to be scheduled to work with employee on team tasks satisfied causation element of employee's Title VII prima facie retaliation claim against employer).

In fact, Courts sometimes analyze the merits of a retaliation claim while noting that the underlying discrimination claim need not be established -- an approach which would be unnecessary if a retaliation claim was automatically doomed if the underlying sexual harassment (or other Title VII violation, such as racial discrimination) failed. *See generally Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999) ("Under Title VII, it is well established that an employee need not prove the underlying claim of discrimination in order to establish a retaliation claim."); *see also Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989) (internal citations omitted) ("Title VII prohibits an employer from discriminating against an employee who has opposed what she believes to be unlawful discrimination. The employee need not prove the underlying claim of discrimination which led to her protest. Instead, an employee's opposition to discrimination is protected if she could reasonably form a good faith belie[f] that the discrimination in fact existed."); *Anderson v. Twitchell-A Tyco Int'l Co.*, 76 F. Supp. 2d 1279, 1288 (M.D. Ala. 1999) (internal citations and quotations omitted) ("[T]he court notes that to recover for retaliation, a plaintiff need not prove the underlying claim of discrimination

which led to her protest, so long as she had a reasonable good faith belief that the discrimination existed.").

Title VII prohibits an employer from retaliating against "any . . . employee[ ] . . . because [s]he has opposed any practice made an unlawful employment practice" by Title VII, "or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The first part of the anti-retaliation provision is known as the "opposition clause" and the second part as the "participation clause." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020); *see E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

The elements of a prima facie case and the analytical framework for retaliation claims made under Title VII, the Florida Civil Rights Act, and § 1981, are the same. *See, e.g., Gray v. City of Jacksonville, Fla.*, 492 F. App'x 1, 3 (11th Cir. 2012) (noting plaintiff's claims of retaliation "under all three statutory frameworks (Title VII, § 1981, and the FCRA) must stand—or fall—together"). The Court therefore will analyze the Title VII and FCRA claims together.

When a plaintiff relies on circumstantial evidence rather than direct evidence for a retaliation claim, we analyze a claim of Title VII and FCRA retaliation under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). First, the employee must make a *prima facie* case showing that: (1) she

engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. Next, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action. If the employer does so, the burden shifts back to the employee to produce evidence that the employer's reason is pretextual. *See Lewis v. Blue Bird Corp.*, No. 20-11397, 2020 WL 6882056, at *2 (11th Cir. Nov. 24, 2020); *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008); *see also Brown v. Alabama Dept. Of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).

Title VII's protections are not limited to formal complaints of discrimination; informal complaints may constitute protected activity as well. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016). For a complaint to be considered a protected activity under Title VII, a plaintiff-employee must show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Id.* (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)).

This includes both a subjective prong -- that the plaintiff in good faith believed the employer was engaged in an unlawful employment practice -- and an objective prong -- that her belief was objectively reasonable. *Id.* (quoting *Little*, 103 F.3d at 960); *see also Herron-Williams v. Alabama State Univ.*, 805 F. App'x 622, 632 (11th Cir. 2020) (affirming summary judgment for defendant because plaintiff, a black female political science professor, failed to show that an email she sent to the university's president constituted protected activity).

"The objective reasonableness of her belief is measured by reference to controlling substantive law." *Id.* (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008)). While a plaintiff is not required to prove that the conduct complained of was actually unlawful, she must still show that the conduct opposed was "close enough to support an objectively reasonable belief that it is." *Id.* (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)).

To show a causal connection, an employee must demonstrate that "the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *McCann*, 526 F.3d at 1376 (alterations adopted) (discussing causation required for a Title VII retaliation claim).

Moreover, a plaintiff in a retaliation case need prove only that retaliatory animus was *one* factor in the adverse employment decision. *See, e.g., Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003).

The employee "can demonstrate causation by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Martin v. Financial Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020).

Concerning the first element, involvement in a statutorily protected activity, it is undisputed that Plaintiff complained to Shechter and Everett about the harassing and intimidatory conduct of Garcia and Neuhof. Plaintiff says this constituted a protected activity. CB disagrees.

Specifically, CB contends that there is no record evidence that Martinez ever complained about *sexual* harassment or discrimination. According to CB, Plaintiff never mentioned to CB sexual harassment or hostile work environment during the limited time she was embroiled in the dispute with Garcia and Neuhof and likewise did not complain about these concerns during her exit interview with the human resources department.

Apparently, CB's position is that Martinez did complain about Garcia and Neuhof to Shechter and Everett -- but that the complaint was, in effect, that they were boorish bullies and jerks, in general (as opposed to being sexual harassers).

Given Neuhof's use of the "C" word and other foul language in other emails and the tenor and language in Garcia's threatening email and follow-up conversation about CB's need to control this "woman," the Undersigned concludes that summary judgment for CB on the ground that Plaintiff's complaint to her supervisor did not relate to *gender* is unavailable. A reasonable jury could construe her complaint as meeting the requirement of engaging in statutorily protected activity. Of course, another reasonable jury could conclude to the contrary. But this two-alternative-scenarios observation is an illustration of what jury trials are all about in the first place.

But Martinez is not yet out of the legal woods on her need to demonstrate that she engaged in statutorily protected activity. She must establish her good faith belief that CB had a duty to prevent the misconduct by the opposing experts and that it breached that duty. This is a close call. As discussed above, Martinez relies on authority holding an

employer liable for the discriminatory conduct of non-employees, such as customers in a store or restaurant or an independent contractor in the workplace. In effect, she seeks to extend that liability theory to discrimination by non-employees outside of the workplace (bur related to the employee's work). Although the Undersigned ultimately rejected that theory, the approach Plaintiff urges is "close enough" to support an objectively reasonable belief that CB should have taken steps against Garcia and Neuhof even though they were not employees.

Returning to the three elements, CB does not attack the causation factor. Rather, its primary challenge is to the second factor. Specifically, CB contends that Martinez did not suffer a materially adverse employment action.

As noted in *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1988) and as used by trial and appellate courts, the Eleventh Circuit uses an objective test for determining whether an employment action is adverse:

> A plaintiff must prove that a reasonable person in her position would view the employment action in question as adverse. **Not everything that makes an employee unhappy is an actionable adverse action**, otherwise every trivial personnel action that an irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.

*Greene v. Loewenstein, Inc.*, 99 F. Supp. 2d 1373, 1382 (S.D. Fla. 2000) (internal citation omitted) (emphasis added). To establish an adverse employment action, a plaintiff must show a "serious and material" change in the terms, conditions or privileges of employment. *David v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001).

"Although the [*McDonnell Douglas* test] does not require any direct economic consequences, the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a "real and demonstrable way," and the asserted impact cannot be speculative and must at least have a "tangible adverse effect" on the plaintiff's employment. *Id.*

Moreover, "federal courts do not sit as 'super-personnel department[s]' that reexamine an employer's business decisions." *Medearis v. CVS Pharmacy, Inc.*, 646 F. App'x 891, 897 (11th Cir. 2016) (citing *Town of Lake Park*, 245 F.3d at 1244).

Typically, an adverse employment action will "affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020); *see also Henderson v. City of Birmingham, Ala.*, 826 F. App'x 736, 741 (11th Cir. 2020).

An adverse employment action extends to actions which fall short of ultimate decisions. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998). Therefore, "actions such as undeserved negative job evaluations, demotions, disadvantageous transfers, or toleration of harassment are actionable . . ." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *see Dekalb Cnty.*, 145 F.3d at 1446 ("[A] transfer may sometimes constitute an adverse action.").

But a "purely lateral transfer . . . if not accompanied by any change in position,

48

title, or salary, and that does not require significant retraining or result in loss of prestige or opportunities for promotion is not an adverse employment action." *Shah v. Clark Atlanta University, Inc.*, No. 97-CV3786CAM, 1999 WL 1042979, at *8 (N.D. Ga. July 20, 1999) (citing *Dekalb Cnty.*, 145 F.3d at 1449-50, 1453); *see also Dekalb Cnty*, 145 F.3d at 1453 ("Any adversity must be material; it is not enough that a transfer imposes some de minimis inconvenience or alteration of responsibilities."); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) ("Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than minor change in working conditions will not do either."); *Hudson v. Southern Ductile Casting Corp.*, 849 F.2d 1372, 1375 (11th Cir. 1988) (finding that plaintiff's alleged demotion to position of plant guard, which resulted in no reduction in pay or loss of benefits, could not support Title VII action).

Therefore, an assessment of Martinez's evidence of the so-called adverse employment action (or actions) and CB's evidence-based explanation of the actions in question is necessary to determine if CB's summary judgment motion on this point should be granted.

As a threshold matter, there is no doubt that there is no one-time, significant event. CB did not terminate Martinez. To the contrary, she voluntarily resigned approximately 15 months after the incident. CB did not place her on suspension. CB did not officially

demote her. It did not directly pressure her to resign. In fact, it offered her the opportunity to continue to work on projects after she left. And CB did not transfer her to another office.

Nevertheless, Martinez points to a smorgasbord of different events which, in her mind, evidence retaliation. And, to the extent that CB challenges the legal significance of the employment-related actions, Martinez argues that a jury should decide the issue.

Not surprisingly, CB stridently disagrees about the interpretation of the events, and also mounts a factual challenge to one of Plaintiff's primary theories: that CB reduced her compensation after she complained about the competing experts' misconduct.

The Eleventh Circuit has noted that the *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2417 (2006) "adverse employment action" standard for retaliation cases is significantly more liberal than the standard previously applied in this Circuit, stating that *Burlington* "strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." *Crawford*, 529 F.3d at 974 n.13; *see also Booth v. Pasco Cnty., Fla.*, 829 F. Supp. 2d 1180, 1191 (M.D. Fla. 2011).

Moreover, "while some adverse actions may not individually rise to the level of an adverse employment action under Title VII, the Court may consider adverse actions **collectively** to determine whether the totality of the alleged actions rise to the a level of substantiality to constitute unlawful retaliation." *Booth*, 829 F. Supp. 2d at 1191 (emphasis

added) (quoting *Cote v. Shinseki*, No. 8:07-cv-1524-T-TBM, 2009 WL 1537901, at *5 (M.D.

Fla. June 2, 2009); *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002);

*see also Henderson v. Dade Cnty. Police Benev. Ass'n, Inc.*, No. 14-20321, 2014 WL 3591600

(S.D. Fla. July 18, 2014) (discussing principles above and concluding that plaintiff's

allegations were sufficient to demonstrate an adverse employment action).

Before pinpointing the specific events which Martinez focuses on to support her

retaliation theory, the Undersigned notes that "the significance of any given act of

retaliation will often depend upon the particular circumstances." *Burlington*, 126 S. Ct. at

2414. The Supreme Court's *Burlington* analysis provides helpful guidance for

determining the significance, if any, of the "particular circumstances":

> **Context matters.** "The real social impact of workplace behavior often
> depends on a constellation of surrounding circumstances, expectations, and
> relationships which are not fully captured by a simple recitation of the
> words used or the physical acts performed." *Oncale, supra,* at 81-82, 118 S.Ct.
> 998. A schedule change in an employee's work schedule may make little
> difference to many workers, but may matter enormously to a young mother
> with school-age children. *Cf., e.g., Washington, supra,* at 662 (finding flex-
> time schedule critical to employee with disabled child). A supervisor's
> refusal to invite an employee to lunch is normally trivial, a nonactionable
> petty slight. But to retaliate by excluding an employee from a weekly
> training lunch that contributes significantly to the employee's professional
> advancement might well deter a reasonable employee from complaining
> about discrimination. *See* 2 EEOC 1998 Manual § 8, p. 8-14. Hence, a legal
> standard that speaks in general terms rather than specific prohibited acts is
> preferable, for an "act that would be **immaterial in some situations is
> material in others**." *Washington, supra,* at 661.

*Id.* at 2415-16 (emphasis added).

One of Martinez's chief points is that she claims that CB limited her involvement

in cases where Garcia's accounting firm was involved, arguing that this reduction in assignments is "extremely significant." [ECF No. 105, p. 18]. She argues that Garcia handled high-profile cases, where she would (if involved as an expert) get exposure to judges and high-profile family law attorneys who might later ask her to be retained on their cases. This, she says, would have helped her in obtaining a promotion and in increasing her book of business.

According to Martinez's theory, CB's decision to reassign her to less-prestigious cases where Garcia was not an expert damaged her professional reputation and hurt her chances for advancement, promotion and the ability to earn more compensation. Therefore, she brands the case reassignment as a material adverse employment action in a "niche industry" involving a "relatively few number of persons active in this area of family law litigation." *Id.*

Voicing a similar concern, Martinez contends that Everett failed to invite her to attend depositions, mediations, or hearings where Garcia or Neuhof were going to be present. She says she also noticed that her involvement in the cases where Garcia's firm was involved became limited to office work, which was a "significant change" from her involvement before she complained in September 2016. *Id.* at p. 19.

In addition to the decreased involvement in Garcia firm cases, Plaintiff contends that CB retaliated by failing to give her a yearly performance review, which she says is a "very subtle and insidious type of retaliation." *Id.* at p. 20. She argues eligibility to be

promoted to senior manager but then notes that this could not be achieved without the annual performance review.

Pointing to her previous positive yearly performance reviews and the absence of write-ups for disciplinary issues in her personnel file, Martinez contends that Shechter's "neutral review" (when she listed CB as her prior employer and sought new employment) and the "not eligible for rehire" status in her personnel file are all further evidence of an adverse employment action needed to support a retaliation claim. *Id.* at p. 22.

CB disputes the argument that these actions and events constitute an adverse employment action. It notes that CB's family law support team in Coral Gables handled 400 to 500 cases per year and that Martinez recalled only four cases where Garcia's firm was the competing forensic accounting expert. Thus, CB argues, having less involvement in the Garcia cases is not legally significant because Martinez's involvement was "always an immaterial portion of her workload." [ECF No. 117, p. 5]. Moreover, at the hearing, CB took issue with the notion that Garcia handled primarily "high-profile" cases.

Moreover, CB emphasizes that Martinez was promoted after the September 2016 incidents with the Garcia firm (though Martinez said the decision to promote her was made before those incidents). CB also notes that Martinez received an increase in her compensation after the misconduct by Garcia and Neuhof.

At bottom, Plaintiff has barely scraped together sufficient evidence to prevent an

adverse summary judgment ruling on the adverse employment action issue. It is certainly more prudent to permit a jury to assess Plaintiff's theory.

On the other hand, given that Martinez seems to have earned more compensation at CB after she complained about Garcia and Neuhof and given that she resigned (and waited 15 months to do so) and then still worked for CB for several weeks, she will have a daunting challenge at trial to convince a jury that she in fact suffered an adverse employment action. *See Crawford v. Carroll*, 529 F.3d at 964 n.1 (explaining that the "facts" stated in a summary judgment context -- which are viewed in favor of the nonmoving party, "may not be the actual facts nor all of the facts.").

Martinez says that CB reduced her assignments in Garcia-involved cases, an allegation which CB challenges. But, even if true, the notion that Martinez complained about Garcia and Neuhof but then rejected the CB offer to remove her from Garcia cases and actually *wanted* to still be involved in Garcia cases involves a scenario which a jury might find fundamentally illogical. On the other hand, perhaps a jury could discern a viable theory to permit these seemingly inconsistent positions to remain without reaching a verdict in CB's favor.

## IV.     Conclusion

Although the conduct of Garcia and Neuhof is reprehensible, that does not necessarily and automatically create liability for CB. Martinez's effort to extend Title VII and FCRA liability to an employer for misconduct perpetrated by a non-employee

outside of the workplace is, while creative, insufficient to generate liability against CB.

The few factors proffered by Martinez to shore up her hostile work environment claim are too feeble to escape an adverse summary judgment ruling for CB.

Her retaliation claims are reed-thin and, although barely enough to avoid summary judgment, will undoubtedly confront substantial hurdles at trial. Martinez might be able to persuade a reasonable jury to accept her retaliation concept, but it is also a reality that a jury could easily reject the approach. Thus, absent a settlement, Martinez will get to display her retaliation claims to a jury and hope for the best. *Cf. Debose v. USF Board of Trustees*, 811 F. App'x 547 (11th Cir. 2020) (affirming order granting employer's motion for a judgment as a matter of law to employer after jury returned verdict for employee on discrimination and retaliation claims).

**DONE AND ORDERED** in Chambers, in Miami, Florida, on December 17, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
All counsel of record

55